# EXHIBIT C



Jessica L. Roe
Attorney

612-351-8305 (D)
612-810-1807 (C)
jroe@roelawgroup.com

60 South Sixth Street
Suite 2670
Minneapolis, MN 55402
612-351-8300 (O)
612-351-8301 (F)
www.roelawgroup.com

April 30, 2019

**VIA EMAIL ONLY (mkass@ArmstrongTeasdale.com)**

Michael B. Kass
Armstrong Teasdale LLP
7700 Forsyth Blvd, Ste 1800
St. Louis, MO 63105

Re: *T.W. Vending Inc. d/b/a TurnKey Corrections v. Anthony Brooks and HomeWAV, LLC*

## RULE 408 SETTLEMENT COMMUNICATION

Dear Mr. Kass:

My client reviewed HomeWAV's offer and finds it unacceptable. We have ample evidence of breach by Mr. Brooks and we believe HomeWAV as well. By way of example, Mr. Brooks made contact with Lawrence County on or about February 11, 2019, indicating he was now with a new company and wanted to talk about what HomeWAV could do for them in the area of video visitation. At this point, my client is not interested in further negotiations.

HomeWAV has two options: (1) terminate Mr. Brooks and agree not to use TurnKey's confidential or proprietary information to interfere with its business relationships; or (2) accept service of the attached Complaint against HomeWAV. Counsel for Mr. Brooks is copied on this communication, along with the Description of Arbitration against Mr. Brooks.

We look forward to hearing from you on or before noon on Thursday, May 2, 2019.

EXHIBIT C

M. Kass
April 30, 2019
Page 2

Very truly yours,

ROE LAW GROUP, PLLC

/s/ *Jessica L. Roe*

Jessica L. Roe
Encl.

cc: Client
 Kevin Urbik, Esq.

EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

T.W. Vending, Inc. d/b/a
TurnKey Corrections

      Plaintiff,

v.

HomeWAV, LLC,

      Defendant.

Case No: _____
Case Type: Torts

**COMPLAINT-
JURY TRIAL
DEMANDED**

TO:    THE ABOVE-NAMED DEFENDANTS.

Plaintiff, for its cause of action against the above-named Defendant, states and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.    Plaintiff T.W. Vending, Inc. d/b/a TurnKey Corrections (hereinafter "TurnKey" or "Plaintiff") is a Minnesota corporation. Its registered address is 12639 20th Street North, West Lakeland, MN 55043 and its principal office is located at 2801 Harvey Street, Hudson, WI 54016.

2.    Defendant HomeWAV, LLC ("HomeWAV") is a Delaware Limited Liability. HomeWAV is licensed to do business in the State of Missouri with a principal office located at 11100 Linpage Place, Suite 200, St. Louis, MO 63132.

3.    Jurisdiction of this matter arises under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

4.    Venue in the Western District of Wisconsin is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred the

1
**EXHIBIT C**

subject contract was executed in the District and the subject contract calls for interpretation under Wisconsin law.

## FACTUAL BACKGROUND

5. TurnKey provides commissary, email, video visitation, law library access, and other services to inmates through contracts with correctional facilities throughout the nation. These services are provided to inmates through kiosks, tablets and other communication devices. Unique among its competitors, TurnKey owns all the code of its proprietary software system and manufactures all of its own kiosks in Wisconsin.

6. TurnKey's reputation, goodwill, and business relationships are of utmost importance to it. TurnKey is therefore committed to proactively meeting industry best practices and ensuring it meets the high standards of its customers.

7. TurnKey's business is highly competitive. It invests considerable effort and financial resources in retaining existing customers and earning business from prospective customers.

8. Anthony Brooks ("Brooks") is a former TurnKey employee. He began employment with TurnKey on or about December 27, 2012. Brooks started with TurnKey in operations and then moved to the position of Sales Manager on or about June 21, 2017.

1. Due to his time with the company, and the many roles he filled while employed by TurnKey, Brooks has a great deal of knowledge pertaining to the trade secrets, confidential information, and other proprietary information of TurnKey.

2. For instance, as a Sales Manager for TurnKey, Brooks was a key employee with access to TurnKey's confidential and proprietary information ("CPI") including client lists,

business plans, order documents and financial information. He also was entrusted with client relationships and the goodwill of TurnKey.

9. On or about July 2, 2018, Brooks signed an Employment Agreement and an Employee Non-Disclosure and Non-Competition Agreement ("Restrictive Covenant Agreement"). Restrictive Covenant Agreement is attached and incorporated by reference as Exhibit A.

10. In connection with the Restrictive Covenant Agreement, Brooks agreed that he would not "solicit any actual or prospective customer or client of the Company . . . for the purpose of selling products or services competitive with the Company's" for 12 months following his termination. "Actual or prospective customer or client" is defined by the Restrictive Covenant Agreement as any customer or client with whom Brooks, or had notice of, at any time during the 12 months preceding his termination from the Company.

11. Brooks also agreed that he would not "accept employment with or render services on behalf of any competitor . . . in any capacity to twelve (12) months following termination of employment."

12. Brooks further agreed as that he would not "use the Company's trade secrets, Proprietary Information, or other competitively sensitive information for the benefit of anyone other than the Company, or in any manner that might be adverse to the Company, or otherwise facilitate or engage in any activity that might amount to unfair competition, including but not limited to interfering with any business relationship or contract between the Company and any of its customers, clients, vendors, suppliers, contractors, or business partners."

13. As consideration for signing the Employment Agreement and Restrictive Covenant Agreement, Brooks received a base salary compensation increase.

14. On or about January 22, 2019, Brooks resigned his employment with TurnKey. His last day of employment with TurnKey was February 15, 2019.

15. Upon information and belief, Brooks immediately went to work for HomeWAV.

16. HomeWAV is a provider of inmate video visitation services and hardware.

17. HomeWAV is a direct competition of TurnKey, providing similar services and competing for the same or similar clients.

18. Brooks' employment with HomeWAV constitutes a breach of the Restrictive Covenant Agreement.

19. Brooks also breached the Restrictive Covenant Agreement when he removed, retained, or otherwise misappropriated TurnKey's CPI, including but not limited to customer contact information, pricing models, and financial information, during and following termination of his employment with TurnKey.

20. Immediately upon beginning work with HomeWAV, Brooks contacted and/or began soliciting TurnKey's actual and prospective customers, using CPI he learned, removed, and/or retained during and after his employment with TurnKey.

21. Upon information and belief, Brooks began discussions with TurnKey customers to move to HomeWAV while he was still employed with TurnKey.

22. Upon information and belief, Brooks began discussions with HomeWAV regarding soliciting TurnKey customers and use of TurnKey's CPI while he was still employed with TurnKey.

23. Brooks' conduct was at the direction of and/or for the benefit of HomeWAV.

24. Although Brooks and HomeWAV knew or had reason to know of Brooks' Restrictive Covenant Agreement and the confidential nature of TurnKey's CPI, Brooks and

HomeWAV are using the CPI to compete unfairly with TurnKey.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

25. TurnKey re-alleges the foregoing paragraphs and incorporates the same herein.

26. Brooks has a valid Restrictive Covenant Agreement with TurnKey.

27. With actual knowledge of the valid Restrictive Covenant Agreement, HomeWAV induced Brooks to breach and/or continue to breach his Restrictive Covenant Agreement with TurnKey without justification or privilege, for its own benefit and to advance its own business interest at TurnKey's expense.

28. HomeWAV's hiring and employment of Brooks to solicit TurnKey's customers and potential customers and use, retention, distribution, disclosure, and/or misappropriation of TurnKey's trade secrets and/or CPI constitutes an intentional, tortious interference with TurnKey's contractual rights under the Restrictive Covenant Agreement.

29. As a direct and proximate result of HomeWAV's acts and omissions, TurnKey has and will suffer damage including but not limited to damage to its reputation and goodwill, loss of business, loss of business opportunities and loss of income and profit.

30. As a direct and proximate result of HomeWAV's acts and omissions, TurnKey has and will incur costs, expenses and attorneys' fees to enforce the Restrictive Covenant Agreement.

31. HomeWAV will continue to engage in the acts complained of herein and, unless restrained or enjoined, will cause TurnKey irreparable damage. It would be difficult to ascertain the amount of compensation which could afford TurnKey adequate relief for such continuing acts. TurnKey's remedy at law is not adequate to compensate it for injuries threatened.

## COUNT II
## TORTIOUS INTERFERENCE WITH PRESENT AND PROSPECTIVE CONTRACTUAL RELATIONSHIPS

32. TurnKey re-alleges the foregoing paragraphs and incorporates the same herein.

33. TurnKey has present and and prospective contractual relationships with its customers and clients. TurnKey had a reasonable expectation that absent improper interference by a third party, these business relationships would continue in the future.

34. HomeWAV has and is intentionally interfering with TurnKey's present and prospective contractual relationships with its clients, including but not limited to Lawrence County, South Dakota, and other present and prospective clients.

35. HomeWAV intentionally and improperly interfered with TurnKey's present and prospective contractual relationships by inducing or otherwise causing third persons or businesses from entering into or continuing a business relationship with TurnKey, or by preventing TurnKey from acquiring or continuing contractual relationships with clients.

36. HomeWAV's interference is not justified or privileged.

37. As a direct and proximate result of HomeWAV's acts and omissions, TurnKey has and will suffer damage including but not limited to damage to its reputation and goodwill, loss of business, loss of business opportunities and loss of income and profit.

38. As a direct and proximate result of HomeWAV's acts and omissions, TurnKey has and will incur costs, expenses and attorneys' fees to prevent additional loss of business and loss of income and profit.

39. HomeWAV will continue to do the acts complained of herein and, unless restrained or enjoined, will cause TurnKey irreparable damage. It would be difficult to ascertain

the amount of compensation which could afford TurnKey adequate relief for such continuing acts. TurnKey's remedy at law is not adequate to compensate it for injuries threatened.

## PRAYER FOR RELIEF

By reasons of HomeWAV's acts herein, TurnKey has and will suffer damage including but not limited to damage to its business, damage to its reputation and goodwill, loss of business, loss of business opportunities, and loss of income and profit.

WHEREFORE, TurnKey prays for the following relief:

1. That this Court grant TurnKey injunctive relief by enjoining and restraining Defendant from employing Anthony Brooks during the pendency of this litigation.

2. That this Court grant TurnKey injunctive relief by enjoining and restraining Defendant, its agents and employees, from contacting, either directly or indirectly, any TurnKey customers or prospective customers during the pendency of this litigation.

3. That this Court grant TurnKey injunctive relief by enjoining and restraining Defendant, its agents and employees, from directly or indirectly using TurnKey confidential and/or proprietary information, including but not limited to customer information, to further their business during the pendency of this litigation.

4. That this Court grant TurnKey injunctive relief by ordering that all TurnKey confidential and/or proprietary information, including but not limited to customer information, whether maintained by electronic or other means, in the possession of Defendant, its agents and employees be immediately returned and delivered to TurnKey.

5. That this Court award TurnKey monetary damages in an amount in excess of $75,000, to be determined at trial. to fairly and adequately compensate it for the pecuniary losses it has incurred and will incur because of the acts of Defendant alleged herein.

6. That this Court award TurnKey injunctive relief, together with expenses, costs, and reasonable attorneys' fees.

7. That this Court award TurnKey any and all other relief, together with prejudgment interest, costs and disbursements as is deemed equitable and appropriate by the Court.

**ROE LAW GROUP, PLLC**

Date: April 30, 2019

/s/ *Jessica L. Roe*
Jessica L. Roe (MN No. 250867)
Shannon N.L. Cooper (MN No. 348077)
60 South Sixth Street, Suite 2670
Minneapolis, MN 55402-3707
Phone: (612) 351-8300
Fax: (612) 351-8301
jroe@roelawgroup.com
scooper@roelawgroup.com

*Attorneys for Plaintiff*

**EXHIBIT C**

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **T.W. Vending, Inc. d/b/a TurnKey Corrections,** ) ) ) **Claimant,** ) ) vs. ) ) **Anthony Brooks,** ) ) **Respondent.** ) ) | Case No. _____ <br><br>**DESCRIPTION OF ARBITRATION CLAIM** |

_____

## **DESCRIPTION OF CLAIM**

1. Claimant T.W. Vending, Inc. d/b/a TurnKey Corrections ("TurnKey") provides commissary, email, video visitation, law library access, and other services to inmates through contracts with correctional facilities throughout the nation. These services are provided to inmates through kiosks, tablets and other communication devices. Unique among its competitors, TurnKey owns all the code of its proprietary software system and manufactures all of its own kiosks in Wisconsin.

2. TurnKey's reputation, goodwill, and business relationships are of utmost importance to it. TurnKey is therefore committed to proactively meeting industry best practices and ensuring it meets the high standards of its customers.

3. TurnKey's business is highly competitive. It invests considerable effort and financial resources in retaining existing customers and earning business from prospective customers.

1

**EXHIBIT C**

4.      TurnKey derives actual or potential independent economic value from its Confidential Information. In fact, TurnKey's Confidential and Proprietary Information ("CPI") is a key component of its success.

5.      If a competitor were to gain access to TurnKey's CPI, such as order and sales data, customer preferences, costs, and profit and pricing models, the competitor could use this information to unfairly compete with TurnKey by undercutting TurnKey's sales.

6.      TurnKey's CPI is not generally known to, and not readily ascertainable by proper means by, the public or others who can obtain economic value from its disclosure or use.

7.      TurnKey made reasonable efforts to maintain the confidential nature and secrecy of its CPI. CPI is stored in password-protected computer programs or platforms, access is limited to employees with a need to know, and employees with such access to it are required to sign confidentiality, non-solicitation, non-compete and/or non-disclosure agreements.

8.      Respondent Anthony Brooks ("Brooks") is a former TurnKey employee. He began employment with TurnKey on or about December 27, 2012. Brooks started with TurnKey in operations and then moved to the position of Sales Manager on or about June 21, 2017.

9.      Due to his time with the company, and the many roles he filled while employed by TurnKey, Brooks has a great deal of knowledge pertaining to the trade secrets and other proprietary information of TurnKey.

10.     For instance, as a Sales Manager for TurnKey, Brooks was a key employee with access to TurnKey's CPI including client lists, business plans, order documents and financial information. He also was entrusted with client relationships and the goodwill of TurnKey.

11.     On or about July 2, 2018, Brooks signed an Employment Agreement and an Employee Non-Disclosure and Non-Competition Agreement ("Restrictive Covenant

2

EXHIBIT C

Agreement"), which was accompanied by a salary increase. The Agreement is attached and incorporated by reference as Exhibit A.

12. In connection with the Restrictive Covenant Agreement, Brooks agreed that he would not "solicit any actual or prospective customer or client of the Company . . . for the purpose of selling products or services competitive with the Company's" for 12 months following his termination. "Actual or prospective customer or client" is defined by the Agreement as any customer or client with whom Brooks worked, or had notice of, at any time during the 12 months preceding his termination from the Company.

13. Brooks also agreed that he would not "accept employment with or render services on behalf of any competitor . . . in any capacity to twelve (12) months following termination of employment."

14. Brooks further agreed as that he would not "use the Company's trade secrets, Proprietary Information, or other competitively sensitive information for the benefit of anyone other than the Company, or in any manner that might be adverse to the Company, or otherwise facilitate or engage in any activity that might amount to unfair competition, including but not limited to interfering with any business relationship or contract between the Company and any of its customers, clients, vendors, suppliers, contractors, or business partners."

15. As consideration for signing the Employment Agreement and Restrictive Covenant Agreement, Brooks received a base salary compensation increase.

16. On or about January 22, 2019, Brooks resigned his employment with TurnKey. His last day of employment with TurnKey was February 15, 2019.

17. Upon information and belief, Brooks immediately went to work for HomeWAV.

18. HomeWAV is a provider of inmate video visitation services and hardware.

19. HomeWAV is a direct competition of TurnKey, providing similar services and competing for the same or similar clients.

20. Brooks' employment with HomeWAV constitutes a breach of the Restrictive Covenant Agreement.

21. Brooks also breached the Restrictive Covenant Agreement when he removed, retained, or otherwise misappropriated TurnKey's CPI, including but not limited to customer contact information, pricing models, and financial information, during and following termination of his employment with TurnKey.

22. Immediately upon beginning work with HomeWAV, Brooks contacted and/or began soliciting TurnKey's actual and prospective customers, using CPI he learned, removed, and/or retained during and after his employment with TurnKey.

23. Upon information and belief, Brooks began discussions with TurnKey customers to move to HomeWAV while he was still employed with TurnKey.

24. Upon information and belief, Brooks began discussions with HomeWAV regarding use of TurnKey's CPI prior to leaving TurnKey.

25. Upon information and belief, Brooks began discussions with HomeWAV regarding soliciting TurnKey customers and use of TurnKey's CPI while he was still employed with TurnKey.

26. Brooks' conduct was at the direction of and/or for the benefit of HomeWAV.

27. Although Brooks and HomeWAV knew or had reason to know of the confidential nature of TurnKey's CPI, Brooks and HomeWAV are using it to compete unfairly with TurnKey.

## COUNT I
## BREACH OF CONTRACT

28. Claimant incorporates the allegations contained in the preceding paragraphs herein.

29. The Restrictive Covenant Agreement between Brooks and TurnKey constitutes a valid and enforceable contract.

30. Brooks breached, and continues to breach, the Restrictive Covenant Agreement by:

   a. Soliciting actual and/or prospective customers or clients of TurnKey, as defined by the Agreement, for the purpose of selling products or services competitive with TurnKey's;

   b. Accepting employment with and rendering services on behalf of HomeWAV, TurnKey's competitor; and

   c. Using the TurnKey's trade secrets, CPI, or other competitively sensitive information for the benefit of himself and/or HomeWAV, or otherwise engaging unfair competition, including but not limited to interfering with TurnKey's business relationship or contracts.

31. As a direct and proximate result of Brooks' acts and omissions, TurnKey has and will suffer damage including but not limited to damage to its reputation and goodwill, loss of business, loss of business opportunities and loss of income and profit, plus interest, attorneys' fees and costs, in an amount to be determined in arbitration and believed to be in excess of $75,000.

## COUNT II
## BREACH OF DUTY OF LOYALTY

32. Claimant incorporates the allegations contained in the preceding paragraphs herein.

33. By virtue of his employment with TurnKey as a key Sales Manager, Brooks owed a duty of loyalty to TurnKey during his employment.

34. During Brooks' employment with TurnKey, he had access to TurnKey client information, pricing and discounts on contracts and was required to keep that information

confidential, and to not use that information to harm TurnKey's business opportunities. As Sales Manager, Brooks was also entrusted with important customer relationships.

35. While still employed by TurnKey, Brooks contacted TurnKey customers including but not limited to Lawrence County, South Dakota, in an effort to solicit them to move their business to his new employer, HomeWAV.

36. While employed by TurnKey, Brooks used his TurnKey sales responsibilities and business relationships to attempt to divert business from TurnKey to HomeWAV, at TurnKey's detriment.

37. As a direct and proximate result of Brooks' acts and omissions, TurnKey has and will suffer damage including but not limited to damage to its reputation and goodwill, loss of business, loss of business opportunities and loss of income and profit, plus interest, attorneys' fees and costs, in an amount to be determined in arbitration and believed to be in excess of $75,000.

## COUNT III
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

38. Claimant incorporates the allegations contained in the preceding paragraphs herein.

39. Brooks intentionally removed or caused TurnKey's Confidential and Proprietary Information ("CPI") to be removed from TurnKey, including but not limited to confidential information regarding TurnKey's customers, which is TurnKey proprietary information and that TurnKey took reasonable steps to protect and keep secret.

40. Brooks misappropriated TurnKey's CPI by improper means, including, but not limited to, theft, misrepresentation, and breach of or inducement of a breach of a duty to maintain secrecy.

41. Brooks' misappropriation of TurnKey's CPI was willful and malicious.

42. As a direct and proximate result of Brooks' acts and omissions, TurnKey has and will suffer damage including but not limited to damage to its reputation and goodwill, loss of business, loss of business opportunities and loss of income and profit, plus interest, attorneys' fees and costs, in an amount to be determined in arbitration and believed to be in excess of $75,000.

**ROE LAW GROUP, PLLC**

Date: <u>April 30, 2019</u>     /s/ *Jessica L. Roe*
Jessica L. Roe (MN No. 250867)
Shannon N.L. Cooper (MN No. 348077)
60 South Sixth Street, Suite 2670
Minneapolis, MN 55402-3707
Phone: (612) 351-8300
Fax: (612) 351-8301
jroe@roelawgroup.com
scooper@roelawgroup.com

*Attorneys for Claimant*